**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DERRICK JACOBS**, | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | |
| | : | |
| **CITY OF PHILADELPHIA, et al.**, | : | |
| | : | |
| Defendant. | : | NO. 19-4615 |
| | : | |

SCOTT W. REID                                                    DATE: June 26, 2024
UNITED STATES MAGISTRATE JUDGE

**OPINION**

I.      *Introduction*

The Defendants, City of Philadelphia, City of Philadelphia Police Department, Christine Coulter, Christopher Flacco and Dennis Wilson, filed a motion to enforce a settlement. (Doc. No. 170). The Plaintiff, Derrick Jacobs, opposes the motion and contends there was no meeting of the minds. (Doc. No. 171). For reasons explained below, I find that there was a settlement agreement and that it should be enforced.[1]

II.     *Background*

The underlying action was filed *pro se* by Plaintiff, Derrick Jacobs.[2] He alleged in his Second Amended Complaint that the Defendants, City of Philadelphia, City of Philadelphia Police Department, Christine Coulter, Christopher Flacco and Dennis Wilson (collectively "Defendants") violated the following statutes: the Fair Labor Standards Act ("FLSA") and the

---

[1] The Defendants' Motion to Enforce the Settlement (Doc. No. 170) was referred to me by the Honorable Joel H. Slomsky on April 23, 2024. (Doc. No. 172).

[2] Jacobs proceeded *pro se* throughout the litigation and during the operative settlement negotiations at issue here. Jacobs did not retain counsel until February 23, 2024 (Doc. No. 166), twelve days prior to the March 7, 2024 settlement conference (Doc. No. 167) before the undersigned.

1

Pennsylvania Wage Payment Collection Law ("PWPCL"). Specifically, Jacobs alleged: (1) an FLSA violation for failure to pay overtime, (2) an FLSA retaliation claim, and (3) a PWPCL violation. (Doc. No. 12). After roughly two years of litigation, the parties entered into settlement negotiations.

On June 20, 2023, the parties conducted settlement negotiations during a phone call between Jacobs and Michael O'Brien, an attorney representing the City of Philadelphia. (Doc. No. 176,11-14, 76:25). The phone call resulted in what appeared to be an agreement to settle the case and on the same day O'Brien sent an email to Jacobs to "confirm [the] agreement to resolve this matter." (Evid. Hear. Exhibit 1 (June 20 Email Confirming Agreement); Doc. No. 176, 13: 21-24, 14: 9-24). The parties also agreed to "carve out" from the settlement any claims Jacobs asserted in a separate lawsuit he filed against the City. (Doc. No. 176, 12: 4-16, 16: 6-12, 30: 6-8)[3].

A critical area of dispute is the timing of payment of settlement proceeds. Jacobs claims that a material term of the agreement was the City would issue the proceeds in 10 days from the date of agreement, while the City claims that there was no agreement to make payment within 10 days. (Doc. 171, 11; Doc 173, 4 at Footnote 2). During the phone call, Jacobs requested a quick turnaround as it related to settlement proceeds. (Doc. 171, 11; Doc. 176, 13:12-13). Specifically, Jacobs sought payment within 10 days. (Doc 171, 11). O'Brien explained the impracticality of such a quick payment given the payment would be made by a municipality. (Doc. No. 176, 13: 8-18). On June 21, O'Brien contacted the Court by email to alert the Honorable Joel H. Slomsky that the parties had reached an agreement. (Doc. No. 160). Jacobs was copied on the email to

---

[3] *Jacobs v. City of Philadelphia*, No. 19-cv-4616, is a case Jacobs simultaneously filed against the City of Philadelphia pending before the Honorable Harvey Bartle in the Eastern District of Pennsylvania. Jacobs did not want to include a release of claims in No. 19-cv-4616 in the release in the present case.

Judge Slomsky and the email itself was filed on the case docket. (Doc. No. 160). Jacobs did not

respond to the email, nor did he file any opposition to the notification of settlement.

On June 29, O'Brien emailed a draft settlement agreement and release to Jacobs. (Doc.

No 170-2, 2). The terms of the agreement included a gross payment of $60,000 from the City to

Jacobs to be paid within 60 days after the City's receipt of the agreement executed by Jacobs and

its receipt from Jacobs of certain tax forms. (Doc. No. 170-2, 3). The draft agreement also

included a section regarding the release of claims, stating that Jacobs would release the City from

"any and all claims, liabilities, demands, and causes of action, known or unknown, fixed or

contingent" that relate or arise out of his employment or separation from employment with the

City. (Doc. No. 170-2, 4). Notably, the draft settlement agreement and release included a "carve

out" of the separate lawsuit Jacobs filed against the City:

> "(c) ***Provided however***, that nothing in this Agreement shall be construed as a waiver of any claims which had been asserted as of June 20, 2023, by Jacobs in E.D.Pa. Docket no. 19-cv-4616 and which are not encompassed within the claims asserted in any of the complains filed by Jacobs in the litigation (Docket no. 19-cv-4615), nor shall anything in this Agreement be construed as a waiver of any claim under the ADEA which may arise after Jacobs executes this Agreement. Jacobs acknowledges that this Agreement released all alleged liabilities and claims asserted in his complaints filed in the litigation (19-cv-4615)."

(Doc. No. 170-2, 5).

The next day, Jacobs responded to O'Brien, stating the draft was "not the settlement

agreement [they] verbally agreed to on June 20, 2023." (Doc. No. 171-2, 12). He added that "if

the defendants do not wish to channel that agreement, [he would] submit a letter to the

Court…stating the differences." (Doc. No. 171-2, 12). O'Brien asked Jacobs to identify the terms

he wanted to revise and send back a draft with his suggestions. O'Brien summarized that, "[their]

discussion provided for full settlement and release of all claims in exchange for $60,000." (Doc.

No. 171-2, 13). Jacobs responded that it was his "understanding [that they] verbally agreed to a

NET $60,000.000 for [his] FLSA DAMAGES ONLY payable in ten (10) days from the executed agreement. [He would] not waive any past, present and/or future claims(s)." (Doc. No. 171-2, 14). O'Brien replied that "[they] did not discuss a 'net' settlement," and added that they initially discussed a quick turnaround in terms of payment, but Jacobs said it was fine if the City would need additional time to process the payment. (Doc. No. 171-2, 15). O'Brien again suggested that Jacobs redline the draft so they could discuss his specific concerns.

Jacobs answered thereafter:

> "…I negotiated in good faith. The payment extension was limited to the new fiscal year. I feel the additions to the agreement (probably by your clients) were meant to cause harm and is an affront to my intelligence. I agreed to a settlement that was not in my best interest to resolve this matter quickly. As a result, the defendants, in my opinion, kicked sand in my face. This is nothing personal against you and/or your representation of your clients. I will contact the Court and inform them the settlement fell through and seek to place this matter back on the calendar."

(Doc. No. 171-2, 17). Notably, Jacobs did not contact the Court to inform Judge Slomsky that the settlement "fell through" or to request that the case be returned to the trial calendar.

On July 5, Attorney Michael Jones[4] sent a revised version of the draft to Jacobs. (Doc. No. 170-3, 2). Jones mentioned that once the language of the draft was finalized, he would send it to Nicole Morris[5] for her approval and would "pin down the time frame on the check so [they could] revise that part of the release." (Doc. No. 170-3, 2). In the revised draft, the tracked changes indicate edits on the language of the release of claims section. (Doc. No. 170-3, 4). Several areas still provided for a carve-out that Jacobs was not waiving claims related to his separate case against the City (No. 19-cv-4616). (Doc. No. 170-3, 5, 7).

---

[4] Attorney Jones is Attorney O'Brien's law partner at Eckert Seamans, the law firm representing the City of Philadelphia. Jones assumed finalizing the settlement with Jacobs because O'Brien was attending to another matter in New York at the time. (Doc. No. 176, 17: 22-23, 33: 16-17, 82: 11-13).
[5] Nicole Morris is the Chief Deputy City Solicitor for the City of Philadelphia. She attended the settlement conference and has been involved in this matter as the representative for the City of Philadelphia.

On July 14, Jones sent a new draft to Jacobs. (Doc. No. 170-4, 2). The draft excluded the subsection providing for exclusion of the other pending case against the City from the release of claims section. (Doc. No. 170-4, 4). The City claims this language was removed at Jacobs' request. (Doc. No. 176, 36: 3-19, 52: 22-25). Instead, the language included a release of all claims "which Jacobs has asserted or could have asserted in the [present case], which includes all claims for compensation for on-call time during his employment, including but not limited to such claims arising under" relevant laws. (Doc. No. 170-4, 4). The same day, Jacobs replied requesting a change of the word "resignation" to the word "retirement." (Doc. No. 170-5, 2). He added they "also need a date certain for disbursement." (Doc. No. 170-5, 4). Jones responded, asking if everything else in the draft "look[ed] ok[ay]." (Doc. No. 170-6, 2). Jacobs said: "Yes. I think I figured out the rest of it." (Doc. No. 170-7, 2).

On July 28, Jones sent an email to Jacobs which stated: "Good talking to you. Only change I made to the latest version is changing it to 45 days. Once you look over the release language again and are good, let me know. Don't forget we need tax forms too." (Doc. No. 170-8, 2). Jones attached a new draft to the email with the amended time for payment reflecting that the City would pay a gross sum of $60,000 to Jacobs within forty-five (45) days after the City's receipt of the Agreement executed by Jacobs and its receipt of the requested tax forms. (Doc. No. 170-8). The release section remained the same as the previous draft. (Doc. No. 170-8, 4).

On September 6, Jacobs replied to Jones' July 28 email:

> "Michael, after reviewing the latest draft, I am extremely dissatisfied. I had to read it a multitude of times to see the agreement was not what we agreed upon and informed the Court. I have been extremely generous in attempting to get this matter resolved, but I feel my status as a pro se litigant has caused the defendants to attempt to take additional liberties. I can no longer trust that the defendants will act in good faith and I believe this matter can only be resolved through a court proceeding."

(Doc. No. 170-9, 2).

Thereafter, Jacobs failed to respond to Jones' attempts to speak to him. (Doc. No. 176, 52:5-6).

On March 7, 2024, the parties appeared for a settlement conference before the undersigned to resolve the aforementioned dispute. (Doc. No. 167). The City took the position that the parties agreed to settle the case. Conversely, Jacobs' position was that a valid settlement was not reached by the parties. After the parties' attempts to resolve the matter were unsuccessful, the City filed a Motion to Enforce the Settlement on April 4, 2024. (Doc. No. 170). Jacobs filed a brief in opposition to the City's motion on April 18, 2024. (Doc. No. 171). A reply brief was filed by the City on April 25, 2024 (Doc. No. 173), and the Court conducted an evidentiary hearing on May 28, 2024. (Doc. No. 175). Since the parties have fully briefed the issues and participated in an evidentiary hearing, the Court is prepared to issue a decision.

III.     *Discussion*

It is well settled that a district court has jurisdiction to enforce a settlement agreement entered into by parties to a case pending before the court. *Pugh v. Super Fresh Food Markets, Inc.*, 640 F.Supp. 1306, 1307 (E.D.Pa.1986); *Rosso v. Foodsales, Inc.*, 500 F.Supp. 274, 276 (E.D.Pa. 1980). Moreover, "when parties stipulate to the settlement of an action they thereby 'consent to the exercise of the court's power to compel compliance.'" *Cooper–Jarrett, Inc. v. Central Transport, Inc.*, 726 F.2d 93, 96 (3d Cir. 1984) (citing *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)). "Such jurisdiction is founded on the policy that favors the amicable adjustment of disputes and the avoidance of costly and time-consuming litigation." *Pugh*, 640 F.Supp. at 1307.

1.  *Enforceability of the Settlement Agreement*

Jacobs disputes the existence of an enforceable agreement, arguing that there was no mutual assent on the two material terms of the contract, specifically the time for payment and release of claims. (Doc. No. 171). The validity and enforceability of settlement agreements is governed by state contract law. *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194 (3d Cir. 2012); *Am. Eagle Outfitters v. Lyle & Scott Ltd*., 584 F.3d 575, 582 (3d Cir. 2009); *Mazzella v. Koken*, 559 Pa. 216, 739 A.2d 531, 536 (1999). Under Pennsylvania law, "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Shell's Disposal & Recycling, Inc.*, 504 F. App'x at *200; *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986). The Court finds that the essential elements of an enforceable settlement agreement are present in the parties' agreement as the parties manifested their intention to be bound by the agreement and agreed to the unambiguous essential terms of the settlement in exchange for payment of $60,000 to Jacobs.

i.  *Intention to be Bound.*

To have entered into a binding contract, the parties must have manifested an intention to be bound. *Shell's Disposal & Recycling, Inc.*, 504 F. App'x at *201 (citing *Channel Home Ctrs.*, 795 F.2d at 298–99); *Am. Eagle Outfitters*, 584 F.3d at 582. "In assessing whether such intent was present, the "object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior. *Am. Eagle Outfitters*, 584 F.3d at 582 (citing *Ingrassia Constr. Co., v. Walsh*, 337 Pa.Super. 58, 486 A.2d 478, 483 (1984). If a party behaves in such a way that a reasonable person would apprehend that he intends to be bound by the terms of the agreement, that party's hidden

subjective intent cannot overcome his outward manifestation of agreement." *Shell's Disposal & Recycling, Inc.*, 504 F. App'x at *201.

Here, the parties' outward manifestation of intent to be bound by the agreement is evident. Jacobs himself memorialized his intent via email on at least three occasions, writing, "this is not the settlement agreement we verbally agreed to on June 20, 2023…," "it was/is my understanding we verbally agreed to a NET $60,000…," and "I agreed to a settlement that was not in my best interest to resolve this matter quickly." (Doc. No. 171-2, 12; Doc. No. 171-2, 14; Doc. No. 171-2, 17) (emphasis added).

The City's intent is demonstrated by the June 20 phone call discussing the resolution, O'Brien's June 20 email to Jacobs confirming the terms of the agreement, the June 21 letter notifying the Court to remove the case from the trial list, and the drafting of four versions of the settlement agreement. (Evid. Hear. Exhibit 1 (June 20 Email Confirming Agreement); Doc. No. 160; Doc. No. 171-2, 13; Doc. No. 171-2, 15; Doc. No. 171-2, 16; Doc. No. 170-3, 2; Doc. No. 170-4, 2; Doc. No. 170-6; 2; Doc. No. 170-8, 2). The City's intent is also reflected by its numerous phone conversations with Jacobs for the purpose of finalizing the language in the settlement agreement, ensuring Jacobs' requested edits were made, and explaining to Jacobs the meaning of the settlement agreement language. (Evid. Hear. Exhibit 4 (Verizon Phone Records); Doc. No. 176, 10:22-23, 34-35, 104:25, 105:12-15, 111:16-21). The language in the emails between the parties alone is sufficient for a reasonable person to apprehend the parties' intent to be bound. Someone would likely not reference a prior discussion as the "settlement agreement we verbally agreed to" or say, "I agreed to a settlement," if they did not intend for both parties to be bound by the promise to perform. In addition, the parties' repeated attempts to conform the written drafts to the verbal agreement's terms is indicative of their intent, as they were working

continuously to mirror the agreement as both parties understood it. Both the written communications and effort to work together to memorialize the agreement demonstrate the parties' similar intent to be bound by the agreement.

Jacobs asserts that the ongoing conversations and exchange of drafts of the settlement agreement between the parties shows they lacked the requisite intent to be bound by the agreement. (Doc. No. 171, 16). Jacobs characterizes these exchanges as continuing negotiations with the intention to enter into an agreement in the future. (Doc. No. 171, 16). Jacobs' own words convey that any edits to the written agreement were mere attempts to memorialize the agreement. As referenced above, Jacobs consistently compares the draft to the verbal agreement and emphasizes that the terms do not match the terms of the agreement as they were discussed previously. (Doc. No. 171-2, 12; Doc. No. 171-2, 14; Doc. No. 171-2, 17). Both parties engaged in the editing process and at no time did they establish the exchange of drafts were negotiations of the essential terms rather than attempts to reduce the verbal agreement to a signed writing. The presence or absence of a signed writing is relevant to the determination of the parties' intent but is not dispositive. *Shell's Disposal & Recycling, Inc.*, 504 F. App'x t 201. If the parties have agreed to the essential terms of a contract, "the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Id*. (citing *Mazzella*, 739 A.2d at 536); *see also Am. Eagle Outfitters*, 584 F.3d at 582 ("[P]arties may bind themselves contractually although they intend, at some later date, to draft a more formal document.") (quoting *Goldman v. McShain*, 432 Pa. 61, 247 A.2d 455, 459 (1968)). The key inquiry is not the extent to which the parties have put their agreement in writing, but rather whether the parties agreed to the essential terms of a contract. *Id.* (citing *Mazzella*, 739 A.2d at 536). While I will further analyze the essential terms in the next section, I note here that the

9

communications and drafts indicate the parties never wavered on those terms that appear to be most essential to their case: the amount to be paid to Jacobs once the agreement was finalized and the release of claims against the City. Thus, the fact that the parties continued to exchange drafts after the initial agreement was reached does not negate their intent to enter into an enforceable agreement. Their behavior, both written and verbal, conveys objective intent to be bound by the agreement they entered into prior to the exchange of drafts.

### ii.   Terms of the Settlement Agreement

"Even when there is evidence of mutual assent, a settlement agreement does not constitute an enforceable contract if there are ambiguities and undetermined matters which render [the] settlement agreement impossible to understand and enforce." *Shell's Disposal & Recycling, Inc.*, 504 F. App'x at *200 (quoting *Mazzella*, 739 A.2d at 537 (internal quotation marks omitted). To be enforceable, an agreement must be certain about "the nature and extent of its obligation[s]." *Am. Eagle Outfitters*, 584 F.3d at 585. That requirement does not mean that the presence of any interpretive ambiguity renders an agreement unenforceable. *Id.* at 585-86. Rather, a contract fails for indefiniteness when it is "impossible to understand" what the parties agreed to because the essential terms are ambiguous or poorly defined. *Id.* at 586.

### a.   Time For Payment

The parties' dispute regarding whether Jacobs was promised payment within ten days of the verbal agreement does not render the agreement ambiguous or unenforceable. Jacobs contends that O'Brien promised him payment of $60,000 within ten days of the verbal agreement on June 20, 2023. (Doc. No. 171, 11). The City argues that such promise was never made, and O'Brien stated at most he represented "that prompt settlement would represent a check now instead of potentially a year or two later." (Doc. No. 173-2, 1). Hornbook contract law states that

10

"when the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement, Second, Contracts, § 204. Pennsylvania courts have routinely relied on this principle, citing that the law implies that the obligation be performed within a reasonable time if the time for performance was left unspecified. *See Hodges v. Penn. Millers Mut. Ins. Co.*, 673 A.2d 973, 974 (Pa. Super. Ct. 1996); *Lefkowitz v. Hummel Furniture Co.*, 385 Pa. 244, 247, 122 A. 2d 802, 804 (1956) ("[W]here no time for performance is provided in the written instrument the law implies that it shall be done within a reasonable time…"); *Hutchinson v. Pennsylvania State Employees' Retirement Bd.*, 738 A.2d 7 (Pa. Commw. Ct. 1999); *Kalkreuth Roofing & Sheet Metal, Inc. v. W. Jefferson Hills Sch. Dist.*, 310 A.3d 1265 (Pa. Commw. Ct. 2023). "A 'reasonable time' is one which comports with community standards of fairness and policy.'" *Siematic Mobelwerke GmbH & Co. KG v. Siematic Corp.*, 643 F. Supp. 2d 675, 687 (E.D. Pa. 2009) (quoting Restatement Contracts § 204). Here, the parties seemingly did not specify a time for payment in the verbal agreement, but that failure is not fatal to the enforcement of the agreement because the Court can provide a reasonable time for payment.

To evaluate the reasonable time for payment in a case involving an entity or organization such as the City of Philadelphia, it is worth noting that a payment period of only ten days after the verbal agreement was unlikely, if not impossible, for the City to perform. "Immediate payment upon the execution of a settlement agreement ignores the reality of business practices," or in this case, levels of bureaucracy within a municipality, "which require time to authorize and process signatures, and deliver payment." *Hawaiian Pumping Specialist Liab. Co. v. K.R.T. LLC*, 2015 WL 687100 (D. Haw. Jan. 29, 2015), *report and recommendation adopted sub nom*

*Hawaiian Pumping Specialist LLC v. K.R.T. LLC*, No. CIV. 14-00409 LEK, 2015 WL 710230
(D. Haw. Feb. 18, 2015). Thus, the ten-day payment period is far short of a reasonable time for
payment. It is virtually unheard of for a governmental entity to issue a settlement check within
ten days of a verbal agreement. Besides the time necessary to process a settlement check, Jacobs
has offered no evidence that the City has (or could) issue a settlement check without a signed
settlement agreement or tax documents, which were requested by the City. As discussed below,
the parties later exchanged many drafts of the written version of the agreement that included a
term for payment within sixty days of the execution of the agreement. Ultimately, the City was
able to commit to a forty-five-day term for payment. I find that thirty days from the date the
agreement is executed is a reasonable amount of time for the City to issue settlement proceeds.

 To further illustrate the futility of Jacobs' argument on this issue, I will briefly highlight
Jacobs' behavior and communications throughout the parties' interactions that show that the time
for payment was not a condition necessary for execution of the agreement. First, Jacobs argues
both that the City failed to perform its obligation to pay him within ten days and that the
agreement was nonexistent because the parties only intended to enter into an agreement in the
future. (Doc. No. 171, 14, 16). He fails to reconcile the contradictions between these two
positions, as the City could not have been obligated to pay Jacobs within ten days if the parties
had not intended to enter into an agreement until a later time.

Second, the first draft of the agreement was sent to Jacobs on June 29, 2023, and included
the term that payment would be made "within sixty (60) days after the City's receipt of [the]
Agreement executed by Jacobs and its receipt of any requested tax forms." (Doc. No. 171-2, 2).
Jacobs' response did not articulate a problem with the time for payment, just that the terms of the
written agreement did not comport with the verbal agreement. (Doc. No. 171-2, 12). Instead of

12

writing to the Court to notify Judge Slomsky that the agreement was invalidated, Jacobs continued to engage with the City in an effort to memorialize the verbal agreement.

On June 30, 2023, which would have been the promised payment date as Jacobs contends, Jacobs told the City that his understanding was payment in "ten (10) days from the executed agreement." (Doc. No. 171-2, 14). After O'Brien explained that their more recent conversations specified that the City "would need additional time to process the payment" and that Jacobs had conceded that, Jacobs seemed to drop the issue. (Doc. No. 171-2, 15). Thereafter, he continued to engage with the City in the exchange of drafts that included the sixty-day payment term. On July 14, 2024, Jacobs requested a date certain for disbursement. (Doc. No. 170-7, 2). Jones responded, asking, "everything else look ok though?" to which Jacobs said, "Yes. I think I figured out the rest of it." (Doc. No. 170-7, 2). This confirmation suggests that Jacobs had reviewed the multiple drafts sent to him and approved of the sixty-day payment term. The final draft sent to Jacobs changed the language to a forty-five-day payment deadline, shortening the period by fifteen days. (Doc. No. 170-8, 3). Only thereafter did Jacobs say he was dissatisfied with the drafts but did not explicitly point to the time for payment as a reason for his dissatisfaction. (Doc. No. 170-9, 2). On any occasion after the lapse of the ten-day period and before his ultimate rejection of the latest draft in September, Jacobs could have objected to the sixty-day period, but did not. Jacobs' willingness to comply with the City's need for an extended time for payment and his engagement after the ten-day period had expired demonstrates that time for payment was not likely not an issue until Jacobs determined he no longer wanted to be bound by the agreement.

In light of the contract law provision that the failure to specify a time for payment simply implies that payment shall be performed within a reasonable time and the parties' ongoing

participation in the memorialization of the agreement after the allegedly promised payment period had passed, the Court finds that the dispute over the time for payment term does not render the contract unenforceable.

### b. Approval

Jacobs argues that because the City never obtained approval of the settlement agreement from Nicole Morris, an enforceable agreement did not exist. (Doc. No. 171, 3). He contends that he only agreed that he received a copy of the proposed agreement, as the versions of the agreements being offered to him were conditioned on Morris' approval. (Doc. No. 171, 5).

Courts in this District and the Third Circuit have previously addressed the issue of contingency in settlement agreements. In *Main Line Theatres, Inc. v. Paramount Film Distributing Corporation*, the Court of Appeals for the Third Circuit found that a settlement contract was binding even when it included a contingency for successful settlement of multiple other cases. 298 F.2d 801 (3d Cir.1962). In *McClure v. Township of Exeter*, the Honorable Berle M. Schiller held that a formal ratification requirement was best described as "an implied condition precedent to the maturation of the remaining duties under the settlement agreement. Civ. A. No. 05–5846, 2006 WL 2794173 at *1 (E.D.Pa. Sep.27, 2006). Finally, in *Phinisee ex rel. Phinisee v. United States*, the Honorable Jacob P. Hart held that a plaintiff was bound by a valid settlement agreement even though the agreement required approval of the DOJ Assistant Attorney General. No. CIV.A. 10-1253, 2012 WL 3186160 (E.D. Pa. Aug. 6, 2012). Judge Hart cited the Third Circuit's decision in *Main Line Theaters, Inc.*: "Unquestionably, a valid bilateral contract may arise even though the promise of one party to perform is qualified by a condition other than the performance of the other party," as long as the condition did not make the promise illusory or enable the promisor to avoid performance at will. *Id*. (citing *Main Line Theatres, Inc.* 298 F.2d at 804); Restatement, Second, Contracts, § 77.

14

In this case, Jacobs and the City were bound by the settlement agreement, and neither Jacobs nor the City could recant it during the time prior to obtaining Morris' approval because her approval did not make the promise illusory nor did the City attempt to avoid performance. In fact, Jones represented that he obtained Morris' approval on July 19, just days before sending over the finalized draft to Jacobs. (Doc. No. 170-8, 2; Doc. No. 173-1, 2). "This is the usual expectation with regards to settlement agreements involving entities which need to obtain municipal approval." *Phinisee ex rel. Phinisee*, No. CIV.A. 10-1253, 2012 WL 3186160 at *5; *Huang v. BP Amoco Corp.*, 271 F.3d 560 (3d Cir.2001) (defendant was obligated by Pennsylvania's implied covenant of good faith and fair dealing to seek third-party approvals, when it had contractually agreed to do so). Accordingly, the settlement agreement reached on June 20, 2023, was binding despite future requirements of approval.

<i>c.</i>   <i>Release of Claims</i>

In Jacobs' opposition brief, he characterizes the release provision in the written agreement as a "general release," arguing that the City was attempting to release Defendants of liability in Jacobs' separate, pending claim (2:19-CV-04616). (Doc. No. 171, 14). However, a reading of the language of the release provision in context reveals that is not the case. First, the City concedes that the parties verbally agreed that Jacobs' other case would be excluded from the release in this case. (Doc. No. 170-11, 1; Doc. No. 171-2, 14). This aspect of the agreement was reflected in a subsection of the first two versions of the draft. (Doc. No. 170-2, 5 ¶¶ (c); Doc. No. 170-3, 5 ¶¶ (b)). The subsequent drafts included language preventing waiver of claims unrelated to the present litigation in a larger release of claims section. (Doc. No. 170-4, 4 ¶¶ (a); Doc. No. 170-8, 4 ¶¶ (a)). Jacobs reviewed the drafts several times and approved the release provision in the written agreement sent on July 14, 2023, indicating the language was consistent with the agreement. (ECF No. 170-7, 2). At no point in the exchange of drafts was the language changed

15

to encapsulate the other pending case. Any edits regarding the release provision of the written agreement were mere attempts to finalize the wording of an agreement already entered into. Further, release clauses are not material terms and attempts to finalize the wording of the release do not preclude enforcement of a settlement agreement. *See, e.g.*, *Good v. PA Railroad Co.*, 384 f.2d 989, 990 (3d Cir. 1967) ("tender of release did not reopen the agreement or make its execution a condition to the settlement itself" when plaintiff's counsel notified the court of settlement, but plaintiff refused to sign defendant's customary form of release and disavowed the settlement); *Swift v. Baskin*, 1995 WL 296273, at *9 (E.D. Pa. May 15, 1995) (Dubois, J.) (tender of a release does not reopen agreement or make its execution a condition to settlement (citing *Kazanjian v. New England Petroleum Corp.*, 480 A.2d 1153, 1157-58 (Pa. Super. 1984)); *Pulcinello v. Consolidated Rail Corp.*, 784 A.2d 122, 125 (Pa. Super. Ct. 2001) (tender of release did not reopen agreement); *Storms v. O'Malley*, 779 a.2d 548, 568 (Pa. Super. Ct. 2001) (execution of release is not an essential term of settlement agreement).

### iii.   Essential Terms and Change of Heart

Insofar as Jacobs aims to persuade this Court that the material terms of the agreement are "not fair" to him, "given his huge losses" and because he was "in a bad way financially as of June, 2023, and sought a quick pay to resolve his issues," his presentation of those facts does not work in his favor. (Doc. No. 171, 14). "One party's change of heart subsequent to a settlement agreement does not vitiate that agreement." *Phinisee ex rel. Phinisee*, No. CIV.A. 10-1253, 2012 WL 3186160 at *5. This is true "even when the change of heart occurs before an oral settlement agreement is reduced to writing." *Id*. (citing *Wyndmoor Learning Ctr. v. City of Wilmington*, 1996 WL 117471 at *6 (E.D.Pa. Mar.12, 1996); *Suber v. Peterson*, 2006 WL 1582312 at 2–4 (E.D.Pa. Jun.2, 2006)). The Court is dissuaded by Jacobs' attempts to poke holes in a valid agreement because his own words and behavior negate his arguments. As previously discussed,

no reasonable person who truly believed to not have been engaged in a binding agreement would so frequently reference such an agreement and express such dismay that the written terms did not match his impression of the verbal agreement.

IV.      Conclusion

There is no ambiguity that the material terms – a payment of $60,000 by the City to Jacobs upon execution of the agreement in exchange for settlement and dismissal of the present action – were agreed upon by the two parties who both intended to be bound by those terms. Time for payment, municipal approval, and terms of the release clause are nonmaterial terms of the agreement in this case.

For the foregoing reasons, the City's Motion to Enforce the Settlement Agreement is hereby granted.

**BY THE COURT:**

*s/Scott W. Reid*
_____
**SCOTT W. REID**
**U.S. MAGISTRATE JUDGE**