IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS,

                    Plaintiff,

        v.

CITY OF PHILADELPHIA, et al.,

                    Defendant.

CIVIL ACTION
NO. 19-4615

## OPINION

**Slomsky, J.**                                    **November 19, 2024**

I.      **INTRODUCTION**................................................................................................ 3

II.     **BACKGROUND** ................................................................................................. 3

  A.  Emails and Phone Exchanges ....................................................................... 4

  B.  Defendant's Motion to Enforce the Settlement Agreement
      and Motion for Approval of the Settlement Agreement ..................................... 8

  C.  Evidentiary Hearing....................................................................................... 9

      1.  Testimony of Michael J. O'Brien, Esquire .............................................. 10

      2.  Testimony of Michael Jones, Esquire ......................................................11

      3.  Testimony of Plaintiff Derrick Jacobs...................................................... 13

  D.  Report and Recommendation ...................................................................... 14

III.    **STANDARD OF REVIEW**............................................................................... 14

IV.     **ANALYSIS**...................................................................................................... 15

A.  The Parties Reached a Valid Settlement Agreement ........................................................... 15

    1.  The Parties Agreed to Settle the Case for $60,000 in Exchange
       for Release of Claims Against the City .................................................. 16

    2.  Time for Payment was Not a Material Term of the Agreement ........................... 19

B.  Plaintiff's Objections to the Report and Recommendation .................................................. 22

    1. Claims One, Two, Three, and Eight:  Plaintiff's Objections
      to Magistrate Judge Scott Reid's Interpretation of the Record ................................... 22

    2. Claim Four:  Approval of Nicole Morris, Esquire ....................................................... 22

    3. Claims Five, Six, and Seven:  Time for Payment ......................................................... 24

C.  Defendants' Motion for Approval of the Settlement Agreement
    Will  Be Granted .......................................................................................................... 25

V.  CONCLUSION ............................................................................................................. 29

## I.    INTRODUCTION

Before the Court is Defendants' City of Philadelphia, Christine Coulter and Dennis Wilson's ("Defendants" or "City") Motion to the Enforce the Settlement Agreement (Doc. No. 170) and Motion for Approval of the Settlement Agreement (Doc. No. 181).  They argue that the parties reached an agreement to resolve this case for the sum of $60,000 in exchange for Plaintiff Derrick Jacobs ("Plaintiff" or "Jacobs") agreeing to dismissal of this litigation and executing a written settlement agreement.  Id.  Plaintiff filed a Response in Opposition claiming that the parties never reached a final settlement.  (Doc. No. 171.)  He avers that between June and September 2023, the parties engaged in settlement negotiations, but they were ultimately unsuccessful.  Id.  Defendants' Motion to Enforce the Settlement Agreement was referred to the Honorable Judge Scott W. Reid for a Report and Recommendation.  Judge Reid conducted an evidentiary hearing in this matter on May 28, 2024.  (Doc. Nos. 175, 176.)  Thereafter, Judge Reid issued a Report and Recommendation recommending that the settlement agreement be enforced.  (Doc. No. 184.)

For the following reasons, the Court will adopt the Magistrate Judge's Report and Recommendation, grant Defendants' Motion to Enforce the Settlement Agreement (Doc. No. 170), and grant Defendants' Motion for Approval of Settlement (Doc. No. 181).

## II.    BACKGROUND

Plaintiff brought this case against Defendants asserting claims under the Fair Labor Standards Act ("FLSA") and Pennsylvania Wage Payment Collection Law ("PWPCL").  (Doc. No. 12.)  Specifically, Plaintiff alleged:  (1) a FLSA violation for failure to pay overtime, (2) a FLSA retaliation claim, and (3) a PWPCL violation.  Id.  After four (4) years of litigation, this Court scheduled this case for trial in July 2023.  (See Doc. No. 142.)  On June 20, 2023, settlement negotiations were discussed during a phone call between Jacobs and Michael O'Brien, Esquire,

counsel for the City of Philadelphia. (Doc. No. 176,11-14, 76:25.) On June 21, 2023, the Court

received notification from O'Brien that the parties had reached an "amicable settlement." (Doc.

No. 160.) After a few months went by, it was apparent that there were disputes among the parties

regarding some terms of the settlement. The facts underlying the dispute have been summarized

in the Report and Recommendation as follows:

> A critical area of dispute is the timing of payment of settlement proceeds. Jacobs
> claims that a material term of the agreement was the City would issue the proceeds
> in 10 days from the date of agreement, while the City claims that there was no
> agreement to make payment within 10 days. (Doc. 171, 11; Doc 173, 4 at Footnote
> 2). During the phone call, Jacobs requested a quick turnaround as it related to
> settlement proceeds. (Doc. 171, 11; Doc. 176, 13:12-13). Specifically, Jacobs
> sought payment within 10 days. (Doc 171, 11). O'Brien explained the
> impracticality of such a quick payment given the payment would be made by a
> municipality. (Doc. No. 176, 13:8-18). On June 21, O'Brien contacted the Court
> by email to alert the Honorable Joel H. Slomsky that the parties had reached an
> agreement. (Doc. No. 160). Jacobs was copied on the email to Judge Slomsky and
> the email itself was filed on the case docket. (Doc. No. 160). Jacobs did not
> respond to the email, nor did he file any opposition to the notification of settlement.

(Doc. No. 184 at 2.)

**A.    Emails and Phone Exchanges**

Between June and September 2023, the parties exchanged several emails and phone calls

discussing the terms of the settlement. Numerous drafts of a Settlement Agreement and Release

were proposed, red-lined, drafted and re-drafted. A timeline of the events surrounding settlement

is as follows:

| June 20, 2023 | The parties agreed to settle this case via telephone. |
|---|---|

| June 21, 2023 | Michael O'Brien, counsel for Defendants, emailed the Court notifying that the parties reached a settlement. (Doc. No. 160.) |
|---|---|

| June 29, 2023 | | O'Brien emailed the **first** settlement agreement draft to Plaintiff. (Doc. No 170-2, 2). The terms of the agreement included a gross payment of $60,000, less required taxes and withholding, from the City to Jacobs to be paid within sixty (60) days after the City's receipt of the agreement executed by Jacobs and its receipt from Jacobs of certain tax forms. (Doc. No. 170-2, 3). The release paragraph stated that Jacobs would release the City from "any and all claims, liabilities, demands, and causes of action, known or unknown, fixed or contingent" that relate or arise out of his employment or separation from employment with the City. (Doc. No. 170-2, 4). The draft agreement and release included a "carve out" of a separate lawsuit Jacobs filed against the City. |
|---|---|---|

| June 30, 2023 | 7:00 a.m. | Plaintiff emailed O'Brien rejecting the first draft because it was "not the settlement agreement [they] verbally agreed to on June 20, 2023." (Doc. No. 171-2, 12.) |
|---|---|---|
| | 7:06 a.m. | O'Brien emailed Plaintiff asking what he would like to revise in the draft. (Doc. No. 171-2, 13.) He summarized that "[their] discussion provided for full settlement and release of all claims in exchange for $60,000." |
| | 7:29 a.m. | Plaintiff responded that he agreed to "a NET $60,000 for my FLSA DAMAGES ONLY payable in ten (10) days from the executed agreement." He also would not waive any of his past, present or future claims. (Doc. No. 171-2, 14.) |
| | 7:34 a.m. | O'Brien responded that they did not discuss a net settlement and that they specifically discussed the City would need more time to process the payment, which Plaintiff agreed to. (Doc. No. 171-2, 15.) |
| | 7:36 a.m. | O'Brien emailed Plaintiff again asking him to redline the draft. (Doc. No. 171-2, 16.) |

| | 10:12 a.m. | Plaintiff responded:<br><br>"Michael, I negotiated in good faith. The payment extension was limited to the new fiscal year. I feel the additions to the agreement (probably by your clients) were meant to cause harm and is an affront to my intelligence. I agreed to a settlement that was not in my best interest to resolve this matter quickly. As a result, the defendants, in my opinion, kicked sand in my face. This is nothing personal against you and/or your representation of your clients. I will contact the Court and inform them the settlement fell through and seek to place this matter back on the calendar." (Doc. No. 171-2, 17.) |
| | | Michael O'Brien asks Michael Jones to take over finalizing the settlement agreement on behalf of Defendants. |
| | 10:42 a.m. | A telephone call was held between Plaintiff and Michael Jones. |

| July 5, 2023 | | Jones emailed the **second** redlined settlement agreement. (Doc. No. 170-3, 2.) Jones mentioned that once the language of the draft was finalized, he would send it to Nicole Morris for her approval and would "pin down the time frame on the check so [they could] revise that part of the release." (Doc. No. 170-3, 2.) In the revised draft, the tracked changes indicate edits on the language of the release of claims section. (Doc. No. 170-3, 4.) Several areas still provided for a carve-out that Jacobs was not waiving claims related to his separate case against the City (No. 19-cv-4616). (Doc. No. 170-3, 5, 7.) |

| July 14, 2023 | 11:27 a.m. | Jones emailed the **third** draft to Plaintiff with new release language. (Doc. No. 170-4, 2.) Here, the language included a release of all claims "which Jacobs has asserted or could have asserted in the [present case], which includes all claims for compensation for on-call time during his employment, including but not limited to such claims arising under" relevant laws. (Doc. No. 170-4, 4.) |

|  | 2:52 p.m. | Plaintiff responded and asked to change word "resignation" to "retirement." (Doc. No. 170-5, 2.) He also asked for a date for disbursement. |
|  | 3:05 p.m. | Jones responded:<br><br>"Got it.  Everything else look ok though?"  (Doc. No. 170-6, 2.) |
|  | 3:20 p.m. | Plaintiff responded:<br><br>"Yes. I think I figured out the rest of it." (Doc. No. 170-7, 2.) |

| **July 28, 2023** | Jones sent a **fourth** revised draft which amended the time for payment reflecting that the City would pay a gross sum of $60,000, less required taxes and withholdings, to Jacobs within forty-five (45) days after the City's receipt of the Agreement executed by Jacobs and its receipt of the requested tax forms.  (Doc. No. 170-8).  The release section remained the same as the previous draft.  (Doc. No. 170-8, 4.) |
|---|---|
| **September 6, 2023** | Plaintiff emailed Jones:<br><br>"Michael, after reviewing the latest draft, I am extremely dissatisfied.  I had to read it a multitude of times to see the agreement was not what we agreed upon and informed the Court.  I have been extremely generous in attempting to get this matter resolved, but I feel my status as a pro se litigant has caused the defendants to attempt to take additional liberties.  I can no longer trust that the defendants will act in good faith and I believe this matter can only be resolved through a court proceeding." (Doc. No. 170-9, 2.) |

The parties allegedly had no communication with one another after Plaintiff's September 6, 2023 email.  On October 12, 2023, Plaintiff filed a letter seeking to place this case back on the

Court's calendar.  (Doc. No. 162.)  On the same day, Defendants filed a letter stating that the parties had agreed to all terms of the settlement and sought referral to a magistrate judge to resolve the case.  (Doc. No. 163.)  This Court then referred the case to Magistrate Judge Reid and a settlement conference was scheduled for March 7, 2024.  (Doc. Nos. 161, 164.)  On February 23, 2024, two (2) weeks before the conference, Shannon Gilbert Timm, Esquire, filed a Notice of Appearance on behalf of Plaintiff, who had appeared pro se throughout this litigation up and until that point.  (Doc. No. 166.)  According to Judge Reid, at the settlement conference, the City took the position that the parties agreed to settle the case while Plaintiff argued that they never reached a final settlement.  (Doc. No. 184 at 6.)

### B.    Defendant's Motion to Enforce the Settlement Agreement and Motion for Approval of the Settlement Agreement

On April 4, 2024, Defendants filed a Motion to Enforce the Settlement.  (Doc. No. 170.) They argue that the parties reached an agreement to resolve this matter for the sum of $60,000 in exchange for Plaintiff agreeing to dismissal of this litigation and executing a settlement agreement and release.  Id. at 1.  They further assert that they engaged in numerous telephone and e-mail communications, described supra, and that after two (2) months of back-and-forth discussion, Plaintiff went back on his agreement to settle and stated that he did not believe "the defendants w[ould] act in good faith."  Id. at 3.  Defendants contend they are entitled to settlement based on the agreed terms of a lump sum payment of $60,000, less required taxes and withholding, in exchange for the written settlement agreement and seek enforcement of the settlement agreement. Id. at 4.

On April 18, 2024, Plaintiff filed a brief in Opposition to the Motion.  (Doc. No. 171.)  A summary of Plaintiff's arguments is as follows:  First, the agreement contained material terms different from those Plaintiff had agreed to, including that Defendants' counsel agreed to a

settlement of $60,000 if payment was to be made within ten (10) days from the date of the agreement.  Id.  Second, the agreement was subject to the approval of Nicole Morris, Esquire,[1] and Plaintiff was never advised that Morris had actually approved in July 2023 the fourth revised settlement agreement.  Id.  Third, the agreement, which was written by Defendants, stated it was neither enforceable nor effective until the settlement agreement has been approved by a court, and Defendants never submitted the agreement to the Court.  Id.

On April 25, 2024, Defendants filed a Reply, insisting that there was an agreement among the parties to settle and that Plaintiff "simply changed his mind, which, undoubtedly, is not an acceptable basis for invalidating a settlement."  (Doc. No. 173.)

On July 24, 2024, Defendants also filed a Motion for Approval of the Settlement Agreement.  (Doc. No. 181.)  In this Motion, they seek approval of the parties' settlement agreement pursuant to the Fair Labor Standards Act ("FLSA").[2]  They argue that after vigorous arms-length negotiations, the parties reached a fair and reasonable settlement.  Id.  And under the FLSA, the parties must seek court approval after a settlement is reached.  Id.

### C.    Evidentiary Hearing

On May 28, 2024, Magistrate Judge Reid conducted an evidentiary hearing with the parties. (Doc. Nos. 175, 176).  At the hearing, Michael J. O'Brien, Esquire, and Michael Jones, Esquire, counsel for Defendants, testified on behalf of Defendants.  Plaintiff testified on his own behalf.

---

[1]  Nicole Morris, Esquire, is the Chief Deputy City Solicitor for the City of Philadelphia.

[2]  In this case, Plaintiff sued the City of Philadelphia for alleged failure to pay overtime for his time spent in "on-call status" as required by the FLSA.

### 1.    Testimony of Michael J. O'Brien, Esquire

O'Brien testified first.  He testified that he had the opportunity to speak with Plaintiff more than ten (10) times regarding the issue of settlement.  (Doc. No. 176, 10:15-23.)  He described his interactions with Plaintiff as cordial and they had a good working relationship.  Id. at 11:1-7. O'Brien testified that after some back and forth regarding the strengths and weaknesses of the case, he and Plaintiff ultimately agreed on a $60,000 settlement amount with full release of all claims. There was also a carve out provision for Plaintiff's other pending lawsuit against the City.  Id. at 11:20-25; 12:1-10.   In regard to a time frame for payment of the settlement proceeds, O'Brien testified:

> A:  As in a – as in any case, we had talked about the advantages of prompt
> settlement as opposed to protracted litigation.   The time frame of
> settlement was discussed.  And Mr. Jacobs, I don't recall specifically what
> he asked for, but a very prompt turnaround was suggested, and it was
> explained to Mr. Jacobs that in a municipality like the City of Philadelphia,
> it was not practical for a ten- or 14-day settlement, we were – we would
> do our best to make sure that he was paid, you know, as soon as reasonably
> possible.

Id. at 13:8-18.  He also sent an email to Plaintiff on the evening on June 20, 2023 confirming the telephone conversation the parties had earlier in the day and confirming the case had been resolved for $60,000 in consideration of a settlement of all claims.  Id. at 14:17-24.  O'Brien did not believe Plaintiff responded to that email.  Id. at 15:1-4.

O'Brien next testified about the exchange of emails, noted supra.  Specifically, he was confronted with an email from Jacobs stating that the agreement sent on June 30, 2023 was not what they agreed to over the phone because they verbally agreed to a net $60,000 for the FLSA damages only and payable within ten (10) days from the execution of the agreement.  O'Brien testified that he never discussed a net sum and that, regarding payment, the parties had more recent

conversations where he advised Plaintiff that the City would need additional time to process the payment and Plaintiff stated that was fine.  Id. at 18:6-25.

O'Brien also denied that the settlement agreement sent to Plaintiff on June 29, 2023 was conditioned upon the approval of Nicole Morris, Esquire.  ("No.  No, that is not true.  The client's – no, that is not true. . . . That did not require further review.  That was final.  Perhaps that's why it took nine days as opposed to 48 or 72 hours.  That agreement was final.  Had Mr. Jacobs signed it, the case would be closed.")  Id. at 29:1-2, 9-15.

### 2.    Testimony of Michael Jones, Esquire

Jones testified that he first communicated with Plaintiff on June 30, 2023 when O'Brien asked him to assist with the Settlement Agreement since O'Brien was dealing with another matter in New York.  Id. at 33:16-25.  At the hearing, Jones was shown a copy of his cellphone records which indicated he had a telephone call with Plaintiff that lasted approximately 166 minutes on June 30, 2023, beginning at 10:42 a.m.  Id. at 34:12-19.  He stated that this conversation largely revolved around Plaintiff's concern about a tax issue and the release language in the Settlement Agreement.  Id. at 35:12-17.   He further testified that he sent Plaintiff a revised draft on July 5, 2023 and that they had subsequent telephone conversations on July 5, 2023 and July 7, 2023.  Id. at 38:13-23.

Regarding payment, Jones testified that on July 27, 2023 he had the following telephone conversation with Plaintiff:

> A:  The only time he ever discussed ten days with me was in the context of when  we got down to the brass tacks of trying to negotiate the time frame for payment, which was really the last term that he and I dealt with because I wanted to get – right, because there were a million moving parts trying to rewrite this release, and I wanted to get the language issues all hammered out so I just had the timing issue.

He did raise ten days with me, but not in the context of he had been promised ten days, but in the context of when we were – our position was 60 originally, and when we were negotiating whether we could do better than the 60 days, he made statements to the effect of the City is kicking sand in my face.  I know they can pay me faster.   I know people who have been paid in ten days, and he said that several times. . . .

But his objection – he never expressed to me any particular importance to a time other than saying he knew people who had gotten paid faster than 60 days.  And as our conversation tightened in on that 60 days, he objected to 60 days on that basis.

I reached out to Mr. O'Brien to reach out to the City to see what was the best that we could possibly do, and the answer we got was the best we could possibly do is 45 days.  And that is --  if memory serves, that is around the Labor Day weekend where I speak to Mr. Jacobs about the best number we have that we can agree to is the 45 days.

And he said, again, the same things about I know people have been paid faster.  The City is kicking sand in my face.  He felt that they were disrespecting him and making him wait longer than other people.  And in my conversation with Mr. Jacobs, I told him, the City is telling me we can't guarantee less than 45.  We might be able to pay it faster than 45, but we can't guarantee it.

And I told him, look, Derrick – I said I am not going to put a number in that agreement that I don't believe we can meet.  I said, the reality of it is we could put a lower number, and if we didn't get the check in time by the time you file a motion, we got a right to respond to it.  I said, it would be moot and we would have the check in hand – in your hand.  But I said, I'm not going to do that because I have been told we can't guarantee it in less than 45, and I am not going to misrepresent it to you.   And he said to me, Mike, I respect that, okay.   And I said so you are okay with the 45, and he said yes.

Id. at 39:7-25-41:1-5.  He also testified that he had a conversation with Plaintiff on September 1, 2023 in which Plaintiff stated that he had signed the release but did not want to disturb Jones because he was on vacation.  Id. at 48:18-25; 49:1-5.  Overall, Jones averred that there was an agreement on June 20, 2023 between the parties to settle the case, and that the material terms of the agreement were to settle for $60,000 and to sign a release reflecting the same.  Id. at 57:11-15.

12

### 3.    Testimony of Plaintiff Derrick Jacobs

Plaintiff's testimony paints a different picture.  Plaintiff recalled speaking with O'Brien in June 2023, initially about continuing trial, then about settling the case.  Id. at 76:24-25, 77:1-7.  Plaintiff testified that O'Brien agreed to the $60,000 payment and would provide him a check the next week, and then O'Brien changed the terms to $60,000 in ten (10) days for the FLSA claim.  Id. at 79:19-25, 80:1-6.  He then received a call from O'Brien a few days later and was informed that Nicole Morris wanted to wait for the next fiscal year for payment and did not want to provide the money within ten (10) days.  Id. at 80:13-25.  Plaintiff agreed to wait until the next fiscal year because the next fiscal year was within "six or seven days."  Id. at 81:1-3.  After receiving the first draft of the settlement agreement, he stated that it was "nothing that [they] discussed, zero, other than the amount on it saying 60 grand."  Id. at 82:1-3.  And after he told O'Brien the same.  He then was put in contact with Jones to handle the agreement.  Id. at 82:4-20.  But, as far as Plaintiff was concerned, the deal was off at this point.  Id. at 82:21-25.

Plaintiff testified that he continued to exchange drafts with Jones and even provided him standard City of Philadelphia settlement agreements.  Id. at 84:5-16.  He stated that he never signed any agreement, and that Jones prefaced every conversation that their changes had to be approved by Nicole Morris.  Id. at 85:12-23; 86:1-13.  Regarding the release, he believed the language was meant to harm him and after he looked it over, he believed he was giving up too much for $60,000 and was no longer willing to settle after giving Defendants "an extra month of two of negotiations."  Id. at 92:23-25-93:1-4.  He further testified about the September 1, 2023 conversation that:  (1) he was never told that Jones was on vacation and (2) he never informed Jones that he signed the agreement.  Id. at 101:17-25.  Rather, he claimed he told Jones that he was still reviewing it.  Id. at 102:7-13.

### D.    Report and Recommendation

On August 5, 2024, Magistrate Judge Reid submitted his Report and Recommendation, recommending that Defendants' Motion (Doc. No. 170) be granted, and that the settlement be enforced.[3]  (Doc. No. 184.)  On August 19, 2024, Plaintiff submitted his Objections to the Report and Recommendation, objecting to Judge Reid's interpretation of the record, that Nicole Morris never approved the settlement agreement, the time for payment was a material term and ultimately the parties never came to a final agreement.[4]  (Doc. No. 185.)  The City filed their Response to Plaintiff's Objections on September 3, 2024.  (Doc. No. 186.)  Defendants' Motion to Enforce the Settlement Agreement (Doc. No. 174) and Motion for Approval of the Settlement Agreement (Doc. No. 181)[5] are now ripe for disposition.

### III.    STANDARD OF REVIEW

Under 28 U.S.C. § 636(b)(1)(B) and the local rules of this Court, a district judge is permitted to designate a magistrate judge to make proposed findings and recommendations on motions to enforce a settlement.  See § 636(b)(1)(B); E.D. PA. CIV. R. 72.1.  Any party may file objections in response to the magistrate judge's report and recommendation.  § 636(b)(1)(C).

---

[3] On June 26, 2024, Magistrate Judge Reid issued an opinion granting Defendants' Motion to Enforce Settlement.  (Doc. No. 178.)  In response, Plaintiff filed a Motion for Reconsideration arguing that it was improper for Magistrate Judge Reid to rule on the Motion.  Rather, he should have submitted proposed findings of fact and recommendations to the district judge for a final decision.  (Doc. No. 180.)  Agreeing with Plaintiff, this Court vacated Judge Reid's Opinion and Order and sent the case back to him for a Report and Recommendation.  (Doc. No. 183.)

[4] These are objections to the Report and Recommendation.  Some are similar to his arguments set forth above in his Opposition to the Motion to Enforce Settlement.

[5] On July 24, 2024, Defendants filed a Motion for Approval of Settlement Agreement (Doc. No. 181), seeking approval of the settlement agreement pursuant to the Fair Labor Standards Act ("FLSA").  Given the similarity of issues, both Motions (Doc. Nos. 170, 181) are discussed seriatim below.

Whether or not an objection is made, a district judge "may accept, reject, or modify, in whole or in part, the findings of recommendations made by the magistrate judge with further instructions." (Id.)  "[I]t must be assumed that the normal practice of the district judge is to give some reasoned consideration to the magistrate's report before adopting it as the decision of the court."  Henderson v. Carlson, 812 F.2d 784, 878 (3d Cir. 1987).

In the Eastern District of Pennsylvania, Local Rule 72.1.IV(a) governs a party's objections to a magistrate judge's report and recommendation.  E.D. PA. CIV. R. 72.1.  Under that rule, a party must "specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections."  Savior v. Superintendent of Huntingdon SCI, No. 11-5639, 2012 WL 4206566, at *1 (E.D. Pa. Sept. 20, 2012).  Upon review, "[a district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  § 636(b)(1)(C).  De novo review is non-deferential and generally permits the district court to conduct an "independent review" of the entire matter.  Salve Regina Coll. v. Russell, 499 U.S. 255, 238 (1991).  "Although [the] review is de novo, [a district judge] [is] permitted, by statute, to rely upon the magistrate judge's proposed findings and recommendations to the extent [the judge], in the exercise of sound discretion, deem[s] proper."  Owens v. Beard, 829 F. Supp. 736, 738 (M.D. Pa. 1993) (citing United States v. Raddatz, 447 U.S. 667, 676 (1980)).

## IV.    ANALYSIS

### A.  The Parties Reached a Valid Settlement Agreement

The Court finds that the parties reached a final agreement to settle this case for $60,000, less required taxes and withholding, in exchange for Plaintiff to release the City of Philadelphia of

all claims that could have been brought in this litigation/claims related to his on-call overtime. (See Doc. No. 170-8 at 2-9.)

A district court has "the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein." California Sun Tanning USA, Inc. v. Elec. Beach, Inc., 369 F. App'x 340, 345 (3d Cir. 2010). "[W]hether it is a valid contract between the parties is determined by reference to state substantive law governing contracts generally. . . ." Sanghavi Jewels, Inc. v. Shalhout, No. 2011-30, 2012 WL 4462046, at *3 (D.V.I. Sept. 27, 2012) (quoting White Farm Equip. Co. v. Kupcho, 792 F.2d 526, 529 (5th Cir. 1986)). "To be enforceable, a settlement agreement must possess all of the elements of a valid contract. As with any contract, it is essential to the enforceability of a settlement agreement that 'the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement.'" Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999) (quoting Onyx Oils & Resins, Inc. v. Moss, 80 A.2d 815, 817 (Pa. 1951)) (citations and alteration omitted). An agreement to settle is binding, even if it was not made in the presence of the court, and even in absence of a signed writing. Green v. John H. Lewis & Co., 436 F.2d 389, 390 (3d Cir. 1970) (citation omitted.)

"Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986).

### 1.  The Parties Agreed to Settle the Case for $60,000 in Exchange for Release of Claims Against the City

A review of the record reveals the parties mutually assented to resolve this case for $60,000. First, Defendant sent an email to the Court notifying it that the parties settled the case. (Doc. No. 160.) Plaintiff was copied on this email and did not respond or dispute this contention. Second,

16

the chain of emails provided by Defendants show that Plaintiff agreed to settle the case. Specifically, on June 20, 2023, Michael O'Brien sent Plaintiff an email memorializing their settlement: the case was resolved for $60,000 with a release of all claims. (Doc. No. 176 at 14:17-24.) Plaintiff did not respond to that email either. Id. at 15:3-4. Then, he sent Plaintiff the initial draft settlement and release agreement for Plaintiff to review and sign. (Doc. No. 170-2.) Plaintiff replied via email rejecting this first draft. The testimony provided above suggests he had issues with the release and time of payment. Jones then gave Plaintiff the opportunity to redline the draft.

Jones next emailed Plaintiff a second/revised agreement "hopefully address[ing] all the concerns [Plaintiff] had about the scope of the release and [sic] remedies in the other litigation." (Doc. No. 170-3.) This second agreement provided that the City would pay Plaintiff "within sixty (60) days after the City's receipt of this Agreement executed by Jacobs and its receipt of any requested tax forms." The parties then had at least two (2) subsequent telephone conversations where Plaintiff sought additional changes to the agreement.

The third draft sent by Jones dated July 14, 2023 involved a similar situation. (See Doc. No. 170-4.) In this exchange, Jones stated that Nicole Morris needed to approve the release language in the agreement, but he wanted to make sure Plaintiff was okay with it first. Plaintiff then requested a further change in the language in Section 5(a), changing his designation from "resignation" to "retirement." (See Doc. No. 170-5.) He also asked for a "date certain for disbursement." Id. And, perhaps most compelling, when Jones asked, "[e]verything else look okay though?", Plaintiff responded, "Yes. I think I figured out the rest of it." (Doc. No. 170-7 at 2.)

Finally, in the last email exchange on July 28, 2023, Jones first wrote, "[g]ood talking to you," confirming a telephone conversation had taken place with Plaintiff prior to the email. (Doc.

No. 170-8 at 2.)  Jones noted that he changed the date of disbursement to forty-five (45) days.  Id.

Plaintiff did not respond to this email for over one (1) month before expressing his dissatisfaction

with the latest draft.  (Doc. No. 170-9.)  He asserted that the draft was not what was agreed upon

and that he felt his "status as a pro se litigant has caused the defendants to attempt to take additional

liberties."  Id.  However, Plaintiff failed to describe what Defendants have done to take advantage

of him.  And when questioned at the evidentiary hearing, Plaintiff testified to the following:

> Q:  As of September of 2023, what was your understanding of when you
>      were going to receive payment of any agreed amount of money?
>
> A:  September 2023?
>
> Q:  Yes, as of September.  You wrote an email.
>
> A:  Yeah, at that point I am ready to go to trial by September.
>
> Q:  Okay, but was there a particular part of release you didn't agree with,
>      or [sic] you just didn't agree in general?
>
> A:  I didn't agree with the release because it seems like the language in there
>      was meant to harm me.  After I looked it over, you know, it was several
>      things that I viewed as I'm signing a lot away for this 60 grand and all
>      this other kind of nonsense that I just wasn't willing to do that after
>      giving them an extra month or two of negotiations.
>
>      I'm not going to stop conversations right there on June 30 when Mr.
>      O'Brien sent me a document, and it was only after I pressured him on
>      June 29 when he sent that document in the evening I could have said,
>      listen, let's go to Judge Slomsky now.  I don't even need—I don't need
>      to talk to you guys no more because now you are full of crap.  Excuse
>      my language.

(Doc. No. 176, 92:13-25, 93:1-11.)  This explanation shows that Plaintiff changed his mind about

settling the case for $60,000 and the terms contained in the release.  However, the previous emails

indicate that the release language was changed numerous times at Plaintiff's request, to which

Defendants obliged, and Plaintiff confirmed in his July 23, 2023 email that he was satisfied with

the agreement.  And while Plaintiff testified at the evidentiary hearing that the settlement was "off"

by the end of June 2023, he continued to engage in finalizing settlement documents for two (2) months.

Taking the facts and circumstances as a whole, Plaintiff agreed to settle this case with Defendants.  He even admitted so at the evidentiary hearing, testifying, "I agreed to a settlement that was not in my best interest to resolve this matter quickly."  (Doc. No. 171-2, 17.)  Thus, the parties manifested an intent to be bound by the terms of the settlement agreement—that Plaintiff would dismiss his claims against Defendants in exchange for $60,000.  This was the original agreement made on June 20, 2023 and repeated throughout telephone calls, emails and draft settlement agreements prepared thereafter.  See California Sun Tanning USA, Inc. v. Elec. Beach, Inc., 369 F. App'x 340, 347 (3d Cir. 2010) (holding e-mails evidenced the parties' mutual assent and intention to be bound by the material terms of the contemplated agreement, including a fixed priced in exchange for release of claims).

### 2. The Time for Payment was Not a Material Term of the Settlement Agreement

Because the Court finds there was a manifestation of mutual assent by the parties to settle this case, it now must be determined whether the parties agreed on the material terms to the settlement agreement.  See Channel Home Ctrs., 795 F.2d at 298-99; Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (1956) ("[I]n order for there to be an enforceable contract, the nature and extent of its obligation must be certain; the parties themselves must agree upon the material and necessary details of the bargain.")  There has been no dispute that $60,000 was the figure to settle the case.  The term in question is whether payment within ten (10) days from the date of the agreement was a material term.  The Court finds that the time for payment was not a material term.

Before a court may enforce a settlement agreement, it must conclude that the parties have reached an agreement on all material terms. Material terms are facts "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "If all the material terms of a bargain are agreed upon, the settlement agreement will be enforced. If, however, there exist 'ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce,' such an agreement must be set aside." Mazella, 739 A.2d at 537 (quoting Miller v. Clay Twp., 555 A.2d 972, 974 (Pa. Commw. Ct. 1989) (citation and alteration omitted). Moreover, "a court cannot summarily deny enforcement of a settlement agreement simply because material facts are in dispute; the task is to resolve the dispute." Castolenia v. Crafa, No. ST-13-CV-243, 2014 WL 239427, at *2 (V.I. Super. Jan. 15, 2014).

Here, the time for payment was a non-material term to the settlement agreement. First, Plaintiff admits in his Objections to the R&R that $60,000 was an essential term that the parties agreed upon. (See Doc. 185 at ¶ 7.) And while he argues that the payment date was also essential, the City of Philadelphia never agreed to this term. In fact, the City conceded that Plaintiff asked for a quick turnaround for time for payment, but specifically acknowledged to him that a ten (10) or fourteen (14) day settlement was not possible. (Doc. No. 176 at 13:8-18.)

Moreover, Plaintiff also admitted that he agreed to a delay in payment into the new fiscal year. Then, he continued to revise the release and settlement documents with Defendants without requiring a ten (10) day payout in July and August 2023. Additionally, in Jones' July 28, 2023 email, he notes that he amended the time for payment after the execution of the settlement agreement from sixty (60) days to forty-five (45) days. Jones submitted that Plaintiff agreed to this timeframe on the phone prior to this email. (See Doc. Nos. 170-11; 173 at n. 2.) While it is

apparent there were multiple discussions about when Plaintiff would be paid, the Court finds that there was no agreement for payment to Plaintiff within ten (10) days of his acceptance of the settlement offer, and that Plaintiff agreed to the forty-five (45) day period as reflected in the latest draft of the settlement agreement.

Further, Plaintiff did not respond that he was dissatisfied with the latest draft until September 6, 2023, a period of forty (40) days from the time he received it.  And when he was asked at the evidentiary hearing what he meant by that, he referred to the release and how he thought he was "signing a lot away" in exchange for $60,000, not the issue of time for payment. (Doc. No. 176, 92:13-25, 93:1-11.)  The testimony indicates that Plaintiff had a change of heart and wanted to take back the settlement.  But it was too late.  The essential terms of the settlement agreement—that Plaintiff would dismiss his claims against Defendants in exchange for $60,000— were agreed to on June 20, 2023 and repeated throughout telephone calls, emails and draft settlement agreements prepared thereafter.  See Frompovicz v. Niagara Bottling, LLC, No. 18-0054, 2020 WL 6118762 (E.D. Pa. Oct. 16, 2020) (finding the plaintiff was bound to a settlement agreement after participating in settlement conference(s), drafting and exchanging multiple settlement agreement drafts and by the defendant presenting a final document for approval).  Thus, the parties only needed time to finalize the non-material terms, including a payout date, once the settlement had been reached.

Moreover, even if the parties did not agree as to the final time for payment, any lack of a time of payment term would not preclude enforcement.  A reasonable time for payment is implied under the law.  See Kalkreuth Roofing & Sheet Metal, Inc. v. W. Jefferson Hills Sch. Dist., No. 751 C.D. 2022, 2023 WL 8868268, at *6 (Pa. Commw. Ct. 2023) ("[E]ven if the parties did not

reach a 'meeting of the minds' regarding the timing of payment, where all other material terms are agreed upon, as they were here, a reasonable time for payment will be implied.")

### B. Plaintiff's Objections to the R&R

#### 1. Claims One, Two, Three, and Eight:  Plaintiff's Objections to Magistrate Judge Scott Reid's Interpretation of the Record

In Plaintiff's first objection, he takes issue with the Magistrate Judge's "repackage[ed]" vacated Order as a Report and Recommendation.  However, the Court finds that Judge Reid adequately submitted findings of fact and recommendations consistent with 28 U.S.C. § 636(b)(1)(B) and (C) in his Report and Recommendation ("R&R").  Plaintiff avers Judge Reid "did not provide this Court with any proposed findings of fact from the evidentiary hearing."  (Doc. No. 185 at 1.)  This is meritless.  There are multiple references to the evidentiary hearing in the R&R.  Judge Reid's findings were based on the evidence presented by both parties, including the testimony presented at the hearing, regarding the issue of settlement.  Plaintiff also asserts other objections where Judge Reid failed to note in his R&R Plaintiff's arguments at the hearing.  Judge Reid covered many in his R&R, and this Court has reviewed all relevant documents and is aware of the events occurring between June 2023 to the present and each parties' position on the issue of settlement.  Moreover, the Court has reviewed this matter de novo, including a summary of each parties' testimony as set forth supra.

#### 2. Claim Four:  Approval of Nicole Morris, Esquire

Plaintiff further argues that the agreement could not have been binding because it was subject to Nicole Morris' approval.  However, O'Brien testified that the initial draft of the settlement agreement was approved and would have been final had Plaintiff signed that agreement. (Doc. No. 176 at 29:1-2, 9-15.)  Then, when multiple changes were made at Plaintiff's request,

Defendants told Plaintiff that they would send the revised agreement to Nicole Morris, Esquire for approval.  (Doc. No. 170-3, 2.)  Jones contends that he did so on July 19, 2023 and he informed Plaintiff that it was approved.  (Doc. No. 173-1 at 2.)  He then sent Plaintiff the final approved settlement agreement on July 28, 2023.  Id.

However, even if Nicole Morris did not approve the settlement agreement, the City was bound to the settlement and would not have been able to withdraw it prior to obtaining Morris' approval.  (Doc. No. 184 at 15.)  Guidance on this point is found in Phinisee ex rel. Phinisee v. United States, where the court held the plaintiff could not repudiate a settlement agreement because it was contingent on approval from the Department of Justice ("DOJ").  No. CIV.A. 10-1253, 2012 WL 3186160 (E.D. Pa. Aug. 6, 2012).  As the Court noted in Phinisee:

> Here as well, both parties were bound by the valid settlement contract, and neither [plaintiff] nor the Government could repudiate it during the short period during which the Government sought approval from the DOJ Assistant Attorney General. This is the usual expectation with regards to settlement agreements involving entities which need to obtain municipal approval.

Id. at 5.

The same applies here.  Nicole Morris is the Chief Deputy City Solicitor for the City of Philadelphia.  It is evident that Defendants were in frequent communication with her throughout the process of finalizing the settlement agreement.  Defendants were open and accommodating to Plaintiff's requests and re-drafted the agreement, specifically the release language, several times. While Defendants did inform Plaintiff that Morris' approval was needed to finalize the agreement, "a valid bilateral contract may arise even though the promise of one party to perform is qualified by a condition other than the performance of the other party."  Id.  (quoting Restatement of Contracts § 77.)  Thus, Morris' approval on the final language did not eliminate the settlement.

Nevertheless, Defendants contend that Nicole Morris did in fact approve the final draft.  (Doc. No. 173-1 at 2.)

### 3.    Claims Five, Six, and Seven:  Time for Payment

In his fifth objection, Plaintiff avers that Judge Reid's conclusion that a verbal agreement for a ten (10) day payment was "unlikely, if not impossible to perform" was not supported by any testimony.  (Doc. No. 185 at 2.)  This is incorrect.  Both O'Brien and Jones testified at the evidentiary hearing that a short time frame for payment was unlikely.  As noted above, O'Brien stated, "[a]nd Mr. Jacobs, I don't recall specifically what he asked for, but a very prompt turnaround was suggested, and it was explained to Mr. Jacobs that in a municipality like the City of Philadelphia, it was not practical for a ten or 14-day settlement, we were – we would do our best to make sure that he was paid, you know, as soon as reasonably possible."  (Doc. No. 176 at 13:8-18.)  Then, Jones testified, "[h]e did raise ten days with me, but not in the context of he had been promised ten days, but in the context of when we were – our position was 60 originally, and when we were negotiating whether we could do better than the 60 days, he made statements to the effect of the City is kicking sand in my face.  I know they can pay me faster.  I know people who have been paid in ten days, and he said that several times. . . ."[6]  Thus, the testimony provided by Defendants supports their position that the City did not agree to a ten (10) day payout.  Moreover, the Court agrees with Judge Reid that it is improbable that a municipality such as the City of Philadelphia would be able to provide payment within ten (10) days of a verbal agreement even with a finalized settlement agreement and proper tax documentation.

---

[6] Jones' complete response at the evidentiary hearing is recited supra.  See also Doc. No. 176 at 39:7-25-41:1-5.

Further, in his sixth and seventh objections, Plaintiff re-asserts that the ten (10) day payout date was a material term to the final settlement agreement.  (Doc. No. 185 at 2.)  However, as described <u>supra</u>, the payment date was not a material term to this agreement.  While there is conflicting testimony about whether Plaintiff initially requested payment within ten (10) days, he admitted that he waived this term by agreeing to be paid in the next fiscal year.  Moreover, Plaintiff asked Jones about a date for disbursement of the funds in the July 14, 2023 email.  (<u>See</u> Doc. No. 170-5.)  This email was more than two (2) weeks into the new fiscal year, and two (2) weeks after Plaintiff testified that the settlement was allegedly already off.

For the reasons stated above, Defendants' Motion to Enforce the Settlement Agreement (Doc. No. 170) will be granted.

### A.  Defendants' Motion for Approval of the Settlement Agreement Will Be Granted

In Defendants' Motion for Approval of the Settlement Agreement, they seek approval of the settlement agreement pursuant to the Fair Labor Standards Act ("FLSA").  (<u>See</u> Doc. No. 181.)  They argue that the parties participated in "vigorous arms-length negotiations", including compromises being made by both parties, and thus a fair and reasonable settlement was reached. <u>Id.</u>

There are two ways that FLSA claims may be settled:  (1) a compromise supervised by the Department of Labor pursuant to 29 U.S.C. § 216(c), or (2) a compromise approved by the district court pursuant to 29 U.S.C. § 216(b).  <u>Adams v. Bayview Asset Mgmt., LLC</u>, 11 F. Supp. 3d 474, 476 (E.D. Pa. 2014).  Courts in this Circuit have looked to the Eleventh Circuit's <u>Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Dep't of Lab., Emp. Standards Admin., Wage & Hour Div.</u> for guidance regarding court approved settlements.  679 F.2d 1350 (11th Cir. 1982).  In <u>Lynn's Food</u>, the court held that when parties present a proposed settlement, the district court may enter a

stipulated judgment "in order to promote the policy of encouraging settlement of litigation." Id. at 1354. However, the settlement must be "a fair and reasonable resolution of a bona fide dispute over [the] FLSA provisions' rather than 'a mere waiver of statutory rights brought about by an employer's overreaching.'" Cuttic v. Crozer-Chester Med. Ctr., 868 F. Supp. 2d 464, 466 (E.D. Pa. 2012) (quoting Lynn's Food, 679 F.2d at 1354). The court should conduct an inquiry to ensure that the settlement is fair and reasonable, and that the agreement furthers the FLSA's implementation in the workplace. See Kraus v. PA Fit II, LLC, 155 F. Supp. 3d 516, 523 (E.D. Pa. 2016).

It should be noted that the parties' agreement to settle is a separate issue from whether the Court will approve of that settlement. Plaintiff argues that their agreement is unenforceable because this Court has not yet approved the terms. This is meritless. The Court cannot approve a settlement agreement that has not been finalized between the parties themselves. Further, Defendants have not disputed that the settlement should be brought before this Court for approval; and they submit that this is an express provision within their own proposed agreement. (See Doc. No. 171 at 13.) Rather, they contend that they were waiting for Plaintiff to sign the finalized settlement agreement. And when Plaintiff refused to sign, Defendants filed the instant Motion to Enforce the Settlement Agreement (Doc. No. 170) and Motion for Approval of Settlement (Doc. No. 181). The Court finds no merit in the argument that Plaintiff could rescind his acceptance of the settlement terms because Defendants had not yet submitted the settlement to this Court.

In any event, after a review of the last settlement agreement sent by Defendants on July 28, 2023, the Court finds that a settlement of $60,000, less required taxes and withholdings, in exchange for release of Plaintiff's claim against the City relating to his "on call status" and other

claims Plaintiff had or could have asserted in this instant case is sufficient to resolve this case. (See Doc. No. 170-8 at 2-9.)

First, under Lynn's Food, there is a bona fide dispute between the parties. Plaintiff's FLSA claim revolves around an alleged failure to receive overtime pay for time spent in "on-call status." (Doc. No. 12 at ¶ 17.) The City has taken the position that time spent in on-call status does not entitle Plaintiff to additional wages. (Doc. No. 18 at ¶ 13.) This was a bona fide dispute.

Second, the Court must determine whether the resolution is fair and reasonable. Lynn's Food, 679 F.2d at 135. Courts in this Circuit have relied upon the factors set forth in Girsch v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) to determine same. Relevant factors include: the complexity, expense and likely duration of the litigation; the stage of the proceedings and the amount of discovery completed; the risks of establishing liability; the risks of establishing damages; the ability of the defendants to withstand a greater judgment; the range of reasonableness of the settlement fund in light of the best possible recovery; and the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation. Id.

Here, the parties conferred to settle this case in advance of the pending trial date in July 2023. Both parties addressed the strengths and weaknesses of their respective cases, and after thoughtful consideration, agreed to settle the case for $60,000. Defendants then filed with the Court notification of settlement on June 21, 2023. The parties drafted and re-drafted the settlement agreement several times, including revisions to the language contained in the release, which Plaintiff ultimately accepted. (See Doc. No. 170-7.) Defendants made sure it included language that allowed Plaintiff to continue his other pending litigation against the City. Further, the amount of the settlement, $60,000, has never been in dispute by either party. There is no compelling reason to disturb this consensus. See Bettger v. Crossmark, Inc., No. 1:13-CV-2030, 2015 WL 279754,

at \*7 (M.D. Pa. Jan. 22, 2015) ("Considering the parties' awareness of the litigable issues at this advanced stage of the proceedings, the court has no doubt that the parties. . . . appreciate the merits of the case.")

In his R&R, Judge Reid recommended the City make payment within thirty (30) days of the executed settlement agreement.  (Doc. No. 184 at 12.)  The Court agrees.  In the initial settlement agreement draft, the City proposed payment within sixty (60) days after Plaintiff executed the agreement and submitted the required tax forms.  (See Doc. No. 170-2 at 3.)  In the last draft exchanged, the City amended the term to forty-five (45) days.  (See Doc. No. 170-8 at 3.)  However, the Court will require payment be made within thirty (30) days of the finalized agreement and submission of tax forms.  This issue has been pending for over one (1) year, the parties have agreed to the terms of the Settlement Agreement, and the City is well aware that they have consented to the $60,000 figure.  In order to effectuate an expeditious but reasonable resolution of this matter, the City should send to Plaintiff the settlement proceeds within thirty (30) days of the signed settlement agreement.[7]

Lastly, the Court must consider whether settlement "furthers the FLSA's implementation in the workplace."  Kraus, 155 F. Supp. 3d at 523.  The Settlement Agreement provides just compensation for the alleged failure to pay the "on-call" time by Defendants.  Further, the release language, which was adjusted on several occasions, is sufficiently limited in scope so as not to impermissibly frustrate the implementation of the FLSA.  The language provides that Plaintiff releases the City and its employees (including named Defendants Flacco, Wilson and Coulter), from all claims relating to his on-call compensation during his employment.  (See Doc. No. 170-4

---

[7] The Court recognizes that it has been well over one (1) year since a settlement was agreed to in this case.  Had the parties come to their own resolution, Plaintiff would have been paid long ago.

at 4); see also Kutz v. Cargill Cocoa & Chocolate, Inc., 19-cv-0176, 2019 WL 5457776, at *8 (M.D. Pa. Oct. 23, 2019) (approving an agreement "limited to the release and discharge of claims asserted in the lawsuit or claims that could have been asserted in the lawsuit.").

Thus, the Court approves of the settlement in this case pursuant to the terms in the settlement agreement exchanged between the parties on July 28, 2023. (See Doc. No. 170-8 at 2-9.) The City is to pay Plaintiff $60,000, less required taxes and withholdings. Id. at 3. However, as discussed above, this Court instructs the City to pay Plaintiff within thirty (30) days of the executed settlement agreement and submission of tax forms.

Therefore, Defendant's Motion for Approval of the Settlement Agreement (Doc. No. 181) will be granted.

V.    CONCLUSION

For the foregoing reasons, the Court will approve and adopt Magistrate Judge Reid's Report and Recommendation (Doc. No. 184). Defendant's Motion to Enforce the Settlement Agreement (Doc. No. 170) will be granted, and Defendant's Motion for Approval of the Settlement Agreement (Doc. No. 181) will be granted. An appropriate Order follows.